# Exhibit B

# Report on Univision NOW Website

## in the Matter of Martinez et al. v. D2C, LLC d/b/a UNIVISION NOW
## (Case No. 1:23-cv-21394-RNS)

Serge Egelman, Ph.D.

April 2, 2024

Introduction...........................................................................................................2

Summary of Opinions............................................................................................5

Background: Collection of Personal Information...................................................5

   Software Development Kits (SDKs).....................................................................6

   Persistent Identifiers...........................................................................................11

   Analytics and Event Reporting...........................................................................15

Website Analysis.................................................................................................19

   Findings..............................................................................................................26

Curriculum Vitae.................................................................................................30

# Introduction

1.  I, Serge Egelman, was asked to provide an expert opinion in the matter of Martinez v. D2C, LLC d/b/a UNIVISION NOW (Case No. 1:23-cv-21394-RNS). In the remainder of this section, I provide information about my background and experience.

2.  I am the Research Director of the Usable Security and Privacy group at the International Computer Science Institute (ICSI), which is an independent research institute affiliated with the University of California, Berkeley. I also hold a position as a research scientist within the Electrical Engineering and Computer Sciences (EECS) Department at the University of California, Berkeley. I am also a co-founder and Chief Scientist of AppCensus, Inc., which is a company that was spun off of my academic research that builds tools to test the privacy behaviors of mobile apps. I received my Ph.D. from Carnegie Mellon University's School of Computer Science. My research has been cited over 12,000 times,[1] and my h-index—the most common metric for scientific impact—is over 50.[2]

3.  I have been performing research into online privacy for nearly twenty years. My research focuses on the interplay of online privacy, computer security, and human factors; in short, I study consumer privacy and security decision making, consumer privacy preferences, privacy and security expectations, and how those expectations comport with reality (e.g., by performing technical analyses of online services and other software to examine privacy and security practices). This research involves both technical knowledge to build tools for use in measurement studies (e.g., observational studies of how user data is

---

[1] https://scholar.google.com/citations?user=WN9t4n0AAAAJ&hl=en
[2] https://en.wikipedia.org/wiki/H-index

collected and shared in practice), as well as a deep understanding of how to apply social science methodologies (e.g., human subjects experiments, surveys, interviews, randomized controlled trials, etc.). I have served as an invited expert for several web standards efforts that pertained to privacy and security, and have received over a dozen awards from the research community (including privacy research awards from two European data protection authorities, AEPD in Spain and CNIL in France; the USENIX Security Symposium Distinguished Paper Award, from one of the top academic computer security conferences; and seven paper awards from the ACM Special Interest Group on Computer-Human Interaction [SIGCHI], the top human-computer interaction conference).

4. Over the past decade, my laboratory has focused on studying the mobile app ecosystem, which has included building tools to detect when personal information is accessed by mobile apps and the third parties with whom they share it. We have used these tools in peer-reviewed published research studies about consumer privacy, including examining mobile apps' compliance with various privacy regulations and platform policies. Based on this research, I am regularly asked to consult for regulatory authorities on privacy issues; I have also testified before the U.S. Senate based on my research. Based on commercial demand for the tools that my lab developed and the data that they produce, I co-founded a company, AppCensus, Inc., which is commercializing my academic research by performing on-demand privacy analysis of mobile apps for developers (e.g., privacy compliance professionals within large enterprises), regulators, and watchdog groups (e.g., journalists and non-profits). My qualifications are described more thoroughly in my curriculum vitae, which appears at the end of this report.

5.  In this report, I performed a technical analysis of the website corresponding to the Univision NOW service. I examined what information was collected by the service (e.g., sensitive and personally identifiable user information) and with whom it was shared. In analyzing the website, I collected data using a standard web browser. In so doing, I demonstrate how users' video viewing information was shared with various third parties, as well as how this information personally identified the users to those third parties. I was also provided with discovery materials that corroborated my findings.

6.  As background in the next section, I explain how "persistent identifiers" are used to track users across apps and services for marketing and other purposes, and how this type of data is collected by "data analytics" and "event reporting" services to surveil consumers, which then often involves the reuse of consumers' identifiable data for secondary commercial purposes (e.g., targeted advertising). I also show that most of these transfers of users' personal data likely occurred without explicit consent. In the subsequent section, I present the results of my analysis of the service's website. Finally, I examined discovery materials from Plaintiffs, Defendant, Endeavor Streaming, and Meta that included metadata about Plaintiffs' viewing history, which I used to determine the manner in which Defendant's service was accessed (e.g., the devices and apps used by Plaintiffs). I opine about the data collected by Defendant as it relates to this case.

7.  The materials I have considered when forming my opinions are cited herein as footnotes. Plaintiffs are paying my normal rate of $1,000 per hour for my services. My compensation is in no way contingent on the outcome of this case. I reserve the right to amend this report, including to reflect new information that becomes available to me in light of the discovery process and/or further rulings from the Court.

# Summary of Opinions

8.  Based on the evidence presented to me, it is clear that the Univision NOW website incorporated the Meta Pixel, and in so doing, transmitted subscribers' personally identifiable viewing information to Meta, a third party.

9.  Based on the configuration of the Pixel, the data transmitted to Meta would have personally identified individual Univision NOW subscribers, as well as the video material that loaded on the Univision NOW website. These transmissions occurred due to overt actions taken by Univision NOW or third-party service providers, like Endeavor Streaming, in intentionally integrating the Meta Pixel with their website.

# Background: Collection of Personal Information

10. As background in explaining how the Univision NOW website was used to collected subscribers' personal information, in this section, I explain how personal information is collected from websites more generally.

11. Internet services are subsidized through the collection of users' personal information for both advertising and analytics purposes. In the case of advertising, this means showing Internet users ads that are specifically tailored to their inferred interests. In the case of analytics, this means observing how users interact with the service in order to maximize its profitability (e.g., strategically including purchase opportunities based on users' observed behaviors, identifying the users most likely to buy expensive items based on their inferred demographics, manipulating users into spending more time using a service, etc.). In other cases, this may mean straight up selling the user data to third parties so that

they may perform these activities and other yet-unknown use cases.

12. Because so much of the Internet is supported by advertisements, one key metric that online services use is known as "engagement," which refers to the amount of time that consumers spend using a service or the frequency of interactions that consumers have with that service. That is, the more time consumers spend using a service that displays ads, the more ads that consumers are likely to be shown. Thus, many services collect analytics data to measure engagement and then use this data to develop features that are likely to lead to greater levels of engagement (i.e., more time spent using the service).

13. The tools used by developers to collect identifiable data from consumers are usually developed by third parties. In the next section, I explain how persistent identifiers enable consumers to be identified and tracked across services, and how analytics and "event reporting" tools capture consumers' online activities.

## Software Development Kits (SDKs)

14. Most modern software heavily relies on complex supply chains: software is comprised of components written by many different organizations. That is, mobile apps—as well as desktop software and online services—often rely on code written by people other than the developer who publishes the software. This use of third-party components is common across most branches of engineering: a car manufacturer generally does not build all of the components included in their vehicles (e.g., cars usually include components manufactured by companies other than the automaker); a construction company generally does not forge the rebar used in their buildings or mine the aggregate used in the concrete. The benefits of this division of labor ("specialization") have been known for

literally centuries:[3] labor specialization allows organizations to streamline operations by focusing their efforts and not wasting time "reinventing the wheel," so to speak.

15. In terms of modern software development, this type of division of labor is often referred to as "code reuse": software components providing specific functionality are designed in ways that allow them to be easily packaged and dropped into a wide variety of software products (e.g., websites and mobile apps);[4] modern programming languages are generally designed with code reuse in mind.[5] These reusable components are often released as "libraries"[6] that provide many different functions, allowing the software engineers who integrate them to pick and choose the functions that they require for their software projects—often only using a very small subset of the functions offered by the library. These libraries are distributed as "software developer kits" (SDKs), which include the functionality, documentation, and examples. There are SDKs integrated into desktop software, mobile apps, websites, etc. The SDK documentation generally describes the "application programming interface" (API), which is the specification for the interface by which the different software components communicate with each other (e.g., the names and definitions of the functions in the software library, their input parameters, and their expected output). There are APIs that the developer must use in order to integrate and use an SDK (i.e., a specification for how to use the SDK's functions), as well as APIs that govern how those SDKs communicate with remote Internet servers. An SDK sending data to a remote server will contact an "API endpoint" and transmit data in a format that

---

[3] *E.g.,* A. Smith. *An Inquiry into the Nature and Causes of the Wealth of Nations*. Strahan and Cadell, London, UK, 1776.
[4] E. Gamma, R. Helm, R. Johnson, and J. Vlissides. *Design Patterns: Elements of Reusable Object-Oriented Software*. Addison-Wesley Professional Computing Series. Pearson Education, 1994.
[5] P. Jalote. *An Integrated Approach to Software Engineering*. Undergraduate texts in computer science. Springer, 1997.
[6] https://en.wikipedia.org/wiki/Library_(computing)

follows that API's specification: an API endpoint is simply a URL on a remote server that expects to receive data in a pre-defined format (i.e., a format that follows the API specification), it then uses that received data to perform an operation, and then provides output in another pre-defined format. Failure to follow an API specification (e.g., due to the use of a deprecated API in an outdated SDK or simply not following an API specification altogether) may result in data not being sent or parsed correctly.

16. For example, a website publisher may wish to monetize their website via ads. Rather than hiring designers and copywriters to create ads and sales people to find potential advertisers, it is more efficient to simply integrate an existing advertising SDK into the website (e.g., eliminating the need to find advertisers, since that activity will be performed by the company distributing the advertising SDK, such as Google or Facebook). This SDK will include API documentation that instructs the website developer on how to use the SDK's various functions. It is then up to the developer to choose which functions to use and how to configure them for their needs (i.e., not all functionality in the SDK will be used by the website). Additionally, because this type of SDK will likely transmit data to and from an advertising network's servers (e.g., to load ads and/or report that a particular ad was viewed by a user), it will similarly communicate with those servers using another API. (Though this latter API is likely not of concern to the integrating website developer: another reason to integrate the ad network's SDK is so that the developer does not need to learn the API for communication between the SDK and the ad network's servers, because the SDK does that for them.) For example, by using the Meta Pixel (Meta's SDK for adding analytics functionality to websites), a website developer does not need to learn the API for communicating with Meta's servers, as the SDK implements that functionality for them; they only need to learn the API to

communicate between their website code and the Meta Pixel.

17. Software developers determine which SDKs they include in their software products and how those SDKs are configured. While the use of SDKs facilitates code reuse, saving software developers time and resources, failure to do so responsibly (e.g., by reading documentation, performing validation tests, etc.) can result in harm to users. Best practices in modern software engineering call for spending significant time testing these components to ensure that they are both configured correctly and that the system functions correctly as a whole, after the components have been integrated. "Correctness" in this case may include verifying that the third-party software components are not being used in ways that violate their developers' terms of service, applicable laws and privacy policies, as well as users' reasonable expectations for the responsible handling of their personal data. For example, Fred Brooks—Turing Award recipient, member of the National Academy of Engineering, and author of the most widely-cited book on software engineering, *The Mythical Man Month*,[7] which is commonly taught in undergraduate software engineering courses—observes that the act of actually writing code should take one sixth of the overall time spent on software engineering: planning (i.e., creating detailed specifications for how software components will interact with each other) should take twice as much time as coding; testing individual components to ensure they are configured correctly (and function as expected) and testing the full system should take half of the entire time spent on software engineering.[8] It is for this reason that code inspections, reviews, and testing, have been key software engineering practices for over 50 years,[9] and are generally core requirements of most quality assurance processes.

---

[7] Frederick P. Brooks, Jr. *The Mythical Man-Month: Essays on Software Engineering*. Addison-Wesley, 1975.
[8] *Id.*
[9] *Supra* note 5.

18. Many SDKs feature configuration options—usually documented in their API specifications—that determine (among other things) what data is collected by the SDK and transmitted to remote servers. For example, Meta (né Facebook)[10] offers website developers a free SDK, the "Meta Pixel," which provides several functions that involve the collection of user data for analytics and advertising purposes: "The Meta Pixel is a piece of code on your website that can help you better understand the effectiveness of your advertising and the actions people take on your site, like visiting a page or adding an item to their cart."[11]

19. Meta provides developers with documentation on how to configure the Pixel so that website publishers do not run afoul of various privacy laws (e.g., GDPR[12] or CCPA[13]), as well as prohibitions against using the Pixel to collect certain types of sensitive data ("Examples of information you should not send to Meta include health or financial information about people, information from or about children under the age of 13…").[14] Their documentation also explains what data may be collected by the Pixel and offers website publishers means to control it:[15] this is important so that website publishers can accurately document their apps' data collection practices in their privacy policies and other disclosures, as well as comply with relevant laws. In some cases, this may mean explicitly obtaining consent from users before allowing the Pixel to commence data collection, a configuration option that Facebook's documentation explicitly recommends for privacy compliance reasons.[16] Both the mobile app SDKs (i.e., there are Meta SDKs

---

[10] In this report, I refer to "Meta" and "Facebook" interchangeably.
[11] https://www.facebook.com/business/tools/meta-pixel
[12] https://developers.facebook.com/docs/meta-pixel/implementation/gdpr/
[13] https://developers.facebook.com/docs/meta-pixel/implementation/data-processing-options/
[14] https://www.facebook.com/business/help/361948878201809?id=188852726110565
[15] https://developers.facebook.com/docs/meta-pixel/
[16] E.g., *supra* note 12.

for both Google's Android and Apple's iOS), as well as the Meta's SDKs for websites (which includes the "Pixel"), include these options.[17]

## Persistent Identifiers

20. Tracking of users' online behaviors is made possible by "persistent identifiers." An identifier is any piece of information that allows an individual—or device—to be uniquely identified.[18] "Persistent" identifiers are identifiers that tend to not change over time. For example, motor vehicles have persistent identifiers in the form of license plates: a license plate uniquely identifies a vehicle and vehicles tend to have the same license plates over time. Thus, if someone records all the license plates at a particular place over time, they can determine how many times in that period any individual vehicle was there (and thus infer their operators' activities). Similarly, if license plates are recorded at many different locations and that data is combined, one could reconstruct the movements of individual vehicles. A social security number is another type of persistent identifier. As can be seen, combining a persistent identifier with information about where that identifier was observed allows a data recipient to reconstruct an individual's activities. Using this knowledge, one could infer information about their routines, preferences, demographics, and even relations and social connections.

21. On the web, persistent identifiers exist in the form of "cookies." A cookie is a piece of data that a web server instructs a web browser to save.[19] A web server—including third-

---

[17] https://developers.facebook.com/docs/meta-pixel/guides/terms-and-policies

[18] National Library of Medicine. Persistent unique identifier. https://www.nnlm.gov/guides/data-glossary/persistent-unique-identifier, 2023. Accessed: March 7, 2023.

[19] Cookies come in two varieties: "session cookies" and "persistent cookies." The former are designed to expire when the user has concluded visiting a particular website. That is, these cookies are used to store information that pertains to that particular session. They generally expire as soon as the user has closed all web browser tabs/windows that are associated with the website that previously set those cookies. These are used, for instance, to automatically log the user out when closing the window or tab. Persistent cookies, on the other hand, are stored in the web browser until they either expire—potentially years into the future—or are deleted by the user or privacy software. Persistent cookies are used, for instance, so that a user does not need to log into a website with every subsequent visit or so that they do not need to specify their language (or other settings) on subsequent visits.

party web servers that are contacted due to third-party content embedded in the original website—can save cookies in a user's web browser. After saving a cookie, the web browser will associate it with the website from which it was received. Every time the web browser visits this website again in the future (or loads third-party content from it), it will transmit the cookie(s) back to the web server, so long as they have not been deleted or expired. Thus, the value of a cookie can be—and are—used to track consumers over time on the web. In some cases, cookies will readily identify consumers by themselves because they store a consumer's name, email address, or other identifying information; in other cases, cookies can be used to indirectly identify consumers because they store persistent identifiers that in conjunction with other readily-ascertainable information allow the consumer to be identified.

22. Cookies often contain identifiers that are considered personal information because they uniquely identify users. (Similarly, while cookies can be deleted or blocked by web browsers and other software, many companies have discovered ways of circumventing these measures, to continue to track consumers' online activities despite consumers' express wishes to the contrary.[20]) For example, even if website users block Meta's cookies (e.g., those used in conjunction with the Pixel), Meta can use additional techniques to identify the Facebook profiles of website users (when those websites integrate the Pixel).[21] Commercial services exist for matching various identifiers (e.g., those contained within cookies) to real-world contact information (e.g., names, addresses, email addresses, phone numbers, etc.), allowing an ordinary person to resolve an online

---

[20] G. Acar, C. Eubank, S. Englehardt, M. Juarez, A. Narayanan, and C. Diaz. The web never forgets: Persistent tracking mechanisms in the wild. In Proceedings of the 2014 ACM SIGSAC Conference on Computer and Communications Security, CCS '14, pages 674–689, New York, NY, USA, 2014. Association for Computing Machinery.
[21] Id.

identifier to an individual's identity. For example, Ameribase Digital claims to be able to link 750 million cookies to 240 million consumer identities, which includes 165 million households (i.e., physical addresses), 600 million email addresses, as well as other unique identifiers (e.g., to identify their mobile devices, as I explain below):[22]



23. As another example, another data broker, FullContact, advertises its ability to map almost 1.4 billion cookie values to almost a billion names and physical addresses, as well as over a billion email addresses:[23]

---

[22] https://ameribase.com/about/
[23] https://www.fullcontact.com/products/resolve/



24. While these are only two examples, entire marketplaces exist for data brokers to sell this type of data specifically for the purpose of "identity resolution" (i.e., mapping online and device identifiers to consumer identities). Acxiom, another data broker, explains that identity resolution allows companies to "bring fragmented data together in an effort to accurately identify, recognize and connect with consumers – anywhere, at any time, across any channel, device, touch point or location.[24] That is, they are up front about the fact that they sell data to allow an ordinary person to convert cookies and other persistent identifiers (e.g., mobile advertising IDs) into consumer contact information, allowing anyone to identify consumers based on those persistent identifiers. Some of the more popular marketplaces where data brokers sell this data include Amazon's AWS

---

[24] https://www.acxiom.com/identity-resolution/

Marketplace,[25] Datarade,[26] and Snowflake Marketplace.[27]

25. Meta uses its cookies to specifically identify individual users so that their Facebook profiles can be identified ("[the Pixel] relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts").[28] This way, Meta can infer consumers' interests via the data it receives from its SDKs (based on the websites they visit, what they do on those websites, etc.), so that when those same individuals are visiting Facebook, Meta can target ads at them based on those inferences.

## Analytics and Event Reporting

26. Traditional software engineering practices involve pre-release user testing with consenting volunteers ("beta testers"). However, with the proliferation of Internet-connected devices and services, software development organizations have discovered that they can save money and collect much more data by "debugging in deployment" (*i.e.*, instrumenting apps and websites to collect large amounts of real-world usage data from all users of the software, often without those users' knowledge or explicit consent).[29] With these analytics SDKs, when predefined actions occur within an app or on a website, data about that event is sent to a third-party service for collection, aggregation, and analysis. This data might include descriptions of the event that occurred, as well as additional data that may describe the user or device. In many cases, this data is personally

---

[25] https://aws.amazon.com/marketplace
[26] https://datarade.ai/
[27] https://app.snowflake.com/marketplace/
[28] https://developers.facebook.com/docs/meta-pixel/get-started
[29] A. Lyons, J. Gamba, A. Shawaga, J. Reardon, J. Tapiador, S. Egelman, and N. Vallina-Rodriguez. "Log: It's Big, It's Heavy, It's Filled with Personal Data! Measuring the Logging of Sensitive Information in the Android Ecosystem." In *Proceedings of the 32nd USENIX Security Symposium*, USENIX Security '23. USENIX Association, 2023.

identifiable (e.g., because it contains persistent identifiers that are specifically designed to identify individuals online), as I explained in the previous section.

27. SDKs that provide analytics services are commonly found in mobile apps and on websites. They provide functionality for software developers to add instrumentation to their apps and services that monitors how those services are used in deployment. These SDKs provide "event reporting" functionality so that specific actions that occur in an app or on a website—actions that are often performed by users ("events")—can be monitored. This allows the developers to remotely debug their apps, as well as to monitor how specific features are being used in practice.

28. The "event data" collected (i.e., transmitted to third-party servers) by these analytics SDKs are generally formatted as "event names" and optionally may include "parameters" or "values." That is, the data appears as variable names that describe the event being recorded and will optionally have an associated value (sometimes referred to as the event's "parameter").[30] In many cases, the event name alone may reveal sensitive information about the user or what they were doing when the event was logged: for example, an event labeled "tested_positive_for_HIV" sent by a health-related app does not need an additional parameter or value associated with it, as the name alone reveals sensitive information about the user. In other cases, collected event data may only reveal sensitive information based on a value/parameter that is transmitted alongside it: for example, an event named "age" may only be useful when examining the integer value that actually reveals the user's age (e.g., "age=30").

29. Event names need not communicate sensitive details in natural language for them to leak sensitive information about consumers. For example, if through Facebook's event data

---

[30] These can basically be thought of as variable names and values.

collection their algorithms learn that a hypothetical event labeled "event12345" is highly correlated with consumers who subsequently join support groups for cancer patients, their algorithms will likely conclude that the hypothetical "event12345" indicates a cancer diagnosis (despite the fact that the word "cancer" may never appear in the event name or value). Thus, the natural language representations of this type of event data has little to do with whether or not it may be leaking sensitive information about consumers.

30. In the case of website analytics, event names may consist of loaded URLs that the user had visited. These URLs may reveal sensitive information about the user: what material she reads or videos that she watches. For example, if a webpage URL uniquely identifies the video embedded in that webpage, then sending that URL to an analytics service (when the user accesses it) reveals to that analytics service that the user watched a particular video. For example, Episode 21 of "Vivir de Amor" is found at the URL https://www.univisionnow.com/category/vivir-de-amor?video=vivir-de-amor-captulo-21 and thus this URL reveals to third-party analytics services that the user is watching this specific video.

31. Sometimes this event data is used for additional secondary purposes, such as tracking and profiling consumers for future advertising (*e.g.*, identifying which users are likely to spend money within the app, selling the data of "high-value" users to advertisers, etc.). Many of the third parties that provide analytics SDKs also provide advertising services or services that support advertising. This is notable because in many cases the privacy policies of these companies indicate that the collected event reporting data may be additionally used for user profiling to support targeted advertising. For example, Facebook's privacy policy[31] states that "device signals" and data received from

---

[31] https://www.facebook.com/privacy/policy/

"partners" and "third parties" will be used to "personalize the ads that people see." (This is corroborated by internal Facebook documents that explain how received data will automatically be used for Facebook's own advertising business.)[32] Due to the complexity of the algorithms used to perform targeted advertising and the massive amounts of data collected to train these algorithms, the companies collecting this data often have a very poor understanding of how any given data point might be used by their systems or how specific inferences are made using that data point. For example, in internal documents, Facebook engineers acknowledged that they cannot prevent data that they receive from being used by their advertising algorithms: "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.' And yet, this is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation."[33]

32. Thus, it is incumbent on the software developers transmitting analytics data to these third-party services to use them responsibly—by not transmitting sensitive data—and to only do so with explicit user consent (especially when the law requires it).

33. Some of the events that are reported to these third parties are predefined by those third parties (often referred to as "standard" events).[34] For example, without additional configuration, Facebook's analytics SDK collects event data when an app is first installed, used, when in-app purchases are made, and after certain crashes:[35]

---

[32] L. Franceschi-Bicchierai. Facebook doesn't know what it does with your data, or where it goes: Leaked document. Motherboard: Tech by Vice, April 26 2022. https://www.vice.com/en/article/akvmke/ facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes.
[33] *Id.*
[34] https://developers.facebook.com/docs/app-events/getting-started-app-events-android#auto-events
[35] *Id.*

> When you use the Facebook SDK, certain events in your app are automatically logged and collected for Facebook unless you disable automatic event logging. These events are relevant for all use cases - targeting, measurement and optimization. There are three key events collected as part of the Automatic App Event Logging: App Install, App Launch, and Purchase. When automatic logging is enabled, advertisers are able to disable these events, as well as other Facebook internal events such as login impression events. However, if you have disabled automatic logging, but still want to log specific events, such as install or purchase events, manually implement logging for these events in your app.

34. Meta's analytics SDK for websites, known as the "Pixel," also has standard events that are collected by default,[36] which include reporting the names of webpages viewed and buttons clicked within those webpages. Thus, if a webpage's title or URL uniquely identify its content, then Meta will learn that a specific consumer accessed that content if the Pixel is present on that webpage. Meta explains to developers that they must install the Pixel on every webpage to receive event data from those webpages ("The Meta Pixel's base code must already be installed on every webpage where you will be tracking events.")[37] By default, Meta's installation instructions cause the Pixel to appear on all webpages within a website,[38] and that a developer must take actions to specifically exclude certain webpages.[39]

# Website Analysis

35. I reviewed both discovery materials and the Univision NOW website for presence of the Meta Pixel, as well as historical versions of it. I was specifically asked to examine what data would have been transmitted to Meta via the Pixel, including whether or not personally identifiable information about a user's video-viewing history would have been shared.

---

[36] https://www.facebook.com/business/help/402791146561655?id=1205376682832142
[37] https://developers.facebook.com/docs/meta-pixel/implementation/marketing-api/
[38] https://developers.facebook.com/docs/meta-pixel/get-started
[39] https://www.facebook.com/business/help/572690630080597?id=1205376682832142

36. In performing this task, I accessed the website using the Firefox web browser (version 122.0)[40] on Mac OS X.[41] When testing the website, I opened a web browser window in "Private Browsing" mode,[42] which guaranteed that cookies and other stored data were deleted after each session (and therefore do not confound subsequent sessions).

37. At the start of each session, I navigated to the Facebook website[43] and logged into an existing Facebook account. This resulted in a cookie for `facebook.com` being stored by the web browser (as shown in the following screenshot, this cookie had an expiration date of one year from the date of testing):[44]



38. As a result of this cookie being stored in the first-party context (*i.e.*, the website asking the web browser to store the cookie was the one that appeared in the web browser's address bar), it may then be sent back to Facebook in the future, whenever the web browser requests data from the `facebook.com` domain, including in the third-party context (*e.g.*, because a non-Meta website chooses to embed the Meta Pixel).[45] Because Facebook's cookie is initially set in the first-party context (*i.e.*, because the user visited

---

[40] https://www.mozilla.org/en-US/firefox/new/
[41] While Chrome has the largest browser market share (see, e.g., ¶ 51), the built-in developer tools that enable the capture of network traffic truncate exported data files over a certain size (see, e.g., https://stackoverflow.com/questions/50551751/chrome-har-file-size-limitation), which make it impractical for this type of analysis that involves viewing streaming videos. Because both browsers follow the same open web standards, using Firefox with its built-in anti-tracking technology disabled (i.e., Chrome does not include anti-tracking technology by default) provides a reasonable approximation of what would have been transmitted by the Chrome browser (or any other browser that does not include privacy-preserving technologies that limit this type of tracking by default, *e.g.*, Microsoft Edge).
[42] https://support.mozilla.org/en-US/kb/private-browsing-use-firefox-without-history
[43] https://www.facebook.com
[44] https://en.wikipedia.org/wiki/HTTP_cookie
[45] https://www.facebook.com/business/tools/meta-pixel

the Facebook website), web browser privacy tools that block third-party cookies may not have the intended effect.

39. This particular cookie included a variable named `c_user` that corresponded to the user's numerical Facebook ID ("FID"). (That is, every Facebook user has a numerical identifier that uniquely identifies their Facebook profile.) With this number, the "Public Profile"[46] page of any Facebook user can be identified and accessed by appending it to the following URL:

> `https://www.facebook.com/profile.php?id=`

40. For example, in the screenshot above, the value of the `c_user` cookie is "100086599394480"; thus, navigating to

> `https://www.facebook.com/profile.php?id=100086599394480` yields

the Facebook profile of the test user account (revealing their name and profile photo):



41. Thus, this identifier—the `c_user` cookie—uniquely identifies a Facebook user and reveals any information on their Public Profile to whomever visits the above URL. Facebook's privacy policy indicates that the Public Profile information, including the

---

[46] https://www.facebook.com/help/203805466323736

user's name and profile photo, is considered public information: *"Your Public Profile includes your name, gender, username and user ID (account number), profile picture, and cover photo. This info is also public."*[47]

42. The specific reason for logging into Facebook prior to testing the non-Facebook website was so that Facebook's cookie would already be set (as would be the case for any consumer who has not logged out of Facebook,[48] which is the vast majority of Facebook users; 79% "never log out of Facebook, 7% log out regularly, and 5% do so always"),[49] when visiting other websites containing the Meta Pixel. This allowed me to examine whether or not the Meta Pixel transmitted the numerical Facebook ID alongside the other webpage metadata that it would have collected and sent to Facebook's servers.[50]

43. Some web browsers now include various anti-tracking technologies (*e.g.*, to specifically prevent the exfiltration of personal information via the Meta Pixel). For the purpose of this report, I disabled such technologies to observe website behaviors in the absence of their protection (as would be the case for the vast majority of Internet users who use default settings, particularly users of Google's Chrome or Microsoft's Edge browsers).

44. I examined the most popular web browsers[51] to determine what information each is likely to transmit to Facebook via the Meta Pixel under default configurations. Each transmission can contain metadata about the webpage in which the Pixel was embedded

---

[47] *Id.*

[48] Online services, particularly social media companies, increasingly make it difficult for users to log out in order to increase user engagement (see, e.g., Terry Nguyen. "The Impossibility of Logging Off." *The Verge*, April 6, 2023. https://www.theverge.com/23670169/logout-button-ui-websites-design-ui-interface).

[49] "Moving the logout button and privacy settings into drop-down menus can be classified as interface interference [14]. Given that Facebook directly benefits from users not logging out (by being able to track them across the web as long as they are logged in), this can be a conscious choice to limit discoverability and thus prevent certain user actions (i.e. logouts)." Thomas Mildner and Gian-Luca Savino. "Ethical User Interfaces: Exploring the Effects of Dark Patterns on Facebook." In *Extended Abstracts of the 2021 CHI Conference on Human Factors in Computing Systems (CHI EA '21)*. Association for Computing Machinery, New York, NY, USA, Article 464, 1–7, 2021.

[50] https://developers.facebook.com/docs/meta-pixel/

[51] https://en.wikipedia.org/wiki/Usage_share_of_web_browsers

(e.g., the URL visited, title of the page, names and URLs of links and buttons, actions taken by the user, etc.) and/or the Facebook cookie (containing the `c_user` value that uniquely identifies the user's Facebook profile):

| Browser | Market Share[52] | Page Metadata | Cookies |
|---------|-----------------|---------------|---------|
| Google Chrome | 66% | ✓ | ✓ |
| Apple Safari | 19% | ✓ | |
| Microsoft Edge | 4% | ✓ | ✓ |
| Mozilla Firefox | 3% | | |

45. While the use of anti-tracking technologies may prevent certain web browsers from transmitting data to Meta via the Pixel, both Meta and the websites integrating the Pixel have access to data that indicates exactly how many consumers were identified by Meta (and matched with their Facebook profiles). For example, Facebook provides privacy settings that allow consumers to view the websites and mobile apps that have sent them data (*e.g.*, as part of event reporting), which Meta then used to successfully identify that user's Facebook profile: "The Meta Pixel is a snippet of JavaScript code that loads a small library of functions you can use to track Facebook ad-driven visitor activity on your website. It relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts."[53] They refer to this as "Off-Facebook Activity."[54] For example, accessing the Facebook settings page for a test user yields the following:[55]

---

[52] *Id.*
[53] https://developers.facebook.com/docs/meta-pixel/get-started
[54] https://www.facebook.com/help/2207256696182627
[55] https://www.facebook.com/off_facebook_activity



Thus, because Facebook is able to show consumers the services that transmitted them data via either the Pixel (from websites) or mobile app SDK, they know exactly how many consumers they were able to identify and therefore estimating consumer usage of anti-tracking technologies is unnecessary: both Meta and Univision NOW know exactly how many users Meta was able to identify.

46. I used the web browser's built in "Web Developer Tools" feature to view and export all network traffic that was generated when visiting each website.[56] This allowed me to capture and decrypt all network traffic associated with the website (including traffic to third parties that was initiated by the website), in contrast to using a proxy server, which may be unable to decrypt requests encrypted using HTTP Strict Transport Security (HSTS),[57] certificate pinning,[58] or other advanced cryptographic techniques.

---

[56] https://firefox-source-docs.mozilla.org/devtools-user/network_monitor/
[57] https://en.wikipedia.org/wiki/HTTP_Strict_Transport_Security
[58] https://owasp.org/www-community/controls/Certificate_and_Public_Key_Pinning

47. In order to corroborate my findings using public data sources, I repeated this procedure using historical archives of the website, as found on the Internet Archive.[59] The Internet Archive periodically copies publicly-available websites, allowing anyone to examine how webpages may have changed over time. It allows us to examine how third-party data collection tools may have historically functioned on a given website, subject to two caveats. First, they only archive publicly-available webpages: sites that require a user to authenticate to access certain content will not be archived (as the Internet Archive is unable to login). Second, they only archive "snapshots" of websites periodically: the dates on which they visit/revisit a website is based entirely on their own schedule and therefore not every website will be archived and not every conceivable date. Thus, the Internet Archive can be used to corroborate that certain third-party data collection tools (e.g., the Meta Pixel) were present on the Univision NOW website in general (and therefore were in use by Univision), however, it cannot be used to determine the full extent of the individual webpages on which they appeared (nor can it be used to determine this for any password-protected webpages, e.g., those requiring a subscriber's account).

48. After interacting with the website (both the current website and its historical versions), I exported the collected network traffic to an HTTP archive ("HAR")[60] file, which I personally analyzed offline using other tools.[61] As part of this analysis, I examined transmissions to third parties that included identifiable user information and descriptive information about any video content the user had viewed on the website during the

---

[59] https://web.archive.org/
[60] https://en.wikipedia.org/wiki/HAR_(file_format)
[61] I used Charles proxy (https://www.charlesproxy.com/) to manually examine the HAR files, as well as to perform string searches to identify the presence of personal information in the network traffic. However, any network traffic analyzer tools that read HAR files can perform this task.

testing period. This included searching for various permutations of the data, including detecting the use of popular encodings (e.g., base64),[62] encryption algorithms (e.g., AES), and common hashing algorithms (e.g., MD5, SHA256, SHA1). Finally, I compared my empirical results with documents that I was provided from discovery, which included documents produced by the Plaintiffs, Defendant, and third party Endeavor Streaming.

## Findings

49. I did not observe the presence of the Meta Pixel when I examined the website on March 26, 2024. However, other evidence demonstrates that it was previously present. For example, using the Internet Archive, the Pixel was installed on the main website going back to early 2016 (i.e., well before the start of the class period).[63] It appears to have been removed in April 2023 or thereafter, as no additional snapshots captured by the Internet Archive indicate its presence after that date. That is, the Internet Archive's snapshot from April 22, 2023, of Univision NOW's main page (i.e., https://www.univisionnow.com) is the latest version with evidence of the Pixel.[64] As shown below, this snapshot attempted to load "https://connect.facebook.net/en_US/fbevents.js," which is the URL for the Pixel:



---

[62] https://en.wikipedia.org/wiki/Base64
[63] https://web.archive.org/web/20160211053446/http://www.univisionnow.com/
[64] https://web.archive.org/web/20230422020848/https://www.univisionnow.com/

50. These approximate dates for the installation of the Pixel are corroborated by discovery documents. For example, an engineering "ticket"[65] from February 2018 instructs developers to install the Pixel on all of Univision NOW's webpages ("Universal Pixel on all pages"). REDACTED REDACTED

"[66]

51. Another ticket from April 2023 instructs developers to remove the Pixel from all of Univision's websites.[67] This ticket also corroborates that the Pixel was installed on all of Univision's pages, including those that host videos (and therefore, the URLs for these pages would uniquely identify the videos that users watched). The ticket instructs developers to "[r]emove [the Pixel] from any URLs /category/xxxx or /channel/xxxx."[68] Based on my examination of the Univision NOW website, these URLs (i.e., those of the form "https://www.univisionnow.com/category/xxxx" or "https://www.univisionnow.com/channel/xxxx") uniquely identify video content on Defendant's website. The ticket further explains that upon removing the Pixel, "The desired result is that a user who navigates to these URLs will not fire network calls to facebook.com."[69] One of the URLs included as an example of URLs that should cease sending data to Facebook (upon successfully implementing the ticket) is "https://www.univisionnow.com/category/perdona-nuestros-pecados?video=perdona-

---

[65] MARTINEZ000530. Modern software engineering uses automated "ticket" systems to manage development processes and assign specific tasks to engineers: stakeholders create tickets (i.e., a request to implement a defined task, such as implementing a new feature or fixing a known bug) that describe software engineering tasks that should be implemented and then these tickets are assigned to developers to implement.
[66] EDRSTREAMING000029.
[67] MARTINEZ000532.
[68] *Id.*
[69] *Id.*

nuestros-pecados-captulo-35,"[70] which corresponds to Episode 35 of "Perdona Nuestros Pecados." Thus, this ticket is further evidence that Facebook was receiving data about individual videos that were loaded on the Univision NOW website, because the Pixel was installed by Univision NOW on the individual pages that hosted specific videos.

52. Thus, the Pixel was present on Defendant's website from at least February 2018 through at least April 26, 2023 (and the ticket to remove was not resolved until May 8, 2023), it would have reported the full URLs accessed by Defendant's subscribers (including URLs that uniquely identified the video content that they viewed), along with each subscriber's unique Facebook ID to Meta.

53. Furthermore, all three named Plaintiffs testified that they used the Google Chrome browser to access both their Facebook accounts and the Univision NOW website to watch videos.[71] They testified that they used the browser's default privacy and security settings,[72] such that third-party cookies (and the Meta Pixel) would not have been blocked. The third-party cookies would also have been present when accessing Univision NOW, as Plaintiffs testified to not logging out of the Facebook website.[73] (This is consistent with published research that found that 79% of Facebook users never log out and therefore likely have the "c_user" cookie present.)[74] Thus, based on those settings, the identity of the URLs for the videos that they watched would have been disclosed to Meta (along with their Facebook ID). Indeed, at least one Plaintiff appeared to be aware of this ("Facebook would show me some relevant information or ads in regards to programs that I had watched on Univision").[75] Plaintiffs had no recollection of consenting

---

[70] MARTINEZ000533.
[71] Giron Deposition at 66; Martinez Deposition at 34–38, 43–44; Rodriguez Deposition at 58.
[72] Rodriguez Deposition at 80–82; Giron Deposition at 77.
[73] Rodriguez Deposition at 54; Martinez Deposition at 64–65.
[74] *Supra* note 49.
[75] Giron Deposition at 49.

to it[76] and object to it.[77]

I declare under penalty of perjury that the foregoing is true and correct.

_____

Serge Egelman, Ph.D.

---

[76] *Id*. at 49.

[77] "The information of the shows that I watch, I don't want that information to be shared with other companies. I dislike that. I don't want other companies to become aware of what I like to watch." *Id.* at 15–16; *Id.* at 34.

# Curriculum Vitae

# Serge Egelman

## contact

2150 Shattuck Avenue
Suite 250
Berkeley, CA 94704
USA

egelman@cs.berkeley.edu

## education

| 2009 | **PhD** in Computation, Organizations, and Society | Carnegie Mellon University |
| | School of Computer Science | |
| 2004 | **BS** in Computer Engineering | University of Virginia |
| | School of Engineering and Applied Science | |

## experience

|  | **AppCensus, Inc.** | San Francisco, CA |
| 2022–Now | Chief Scientist / Co-Founder | |
| 2019–2022 | CTO / Co-Founder | |
|  | **International Computer Science Institute** | Berkeley, California |
| 2016–Now | Research Director, Usable Security & Privacy Group | |
| 2013–2016 | Senior Researcher, Networking and Security Group | |
|  | **University of California, Berkeley** | Berkeley, California |
| 2011–Now | Research Scientist, Electrical Engineering and Computer Sciences | |
|  | **National Institute of Standards and Technology** | Gaithersburg, Maryland |
| 2010–2011 | Research Scientist, Visualization and Usability Group | |
|  | **Brown University** | Providence, Rhode Island |
| 2009-2010 | Postdoctoral Researcher, Computer Science Department | |
|  | **Microsoft Research** | Redmond, Washington |
| 2008 | Research Intern, Security and Privacy Group | |
| 2008 | Research Intern, VIBE Group | |
|  | **PARC** | Palo Alto, California |
| 2006 | Research Intern, Computer Science Laboratory | |

## publications*

### refereed journal publications

A Model of Contextual Factors Affecting Older Adults'
   Information-Sharing Decisions in the U.S.
   *Frik, A., Bernd, J., and Egelman, S.* ACM Transactions on Computer-Human Interaction *30.1 (Apr. 2023). Association for Computing Machinery.*

Lessons in VCR Repair: Compliance of Android App Developers with the California Consumer
   Privacy Act (CCPA)

*Over 12,000 citations and h-index=52: https://scholar.google.com/citations?hl=en&user=WN9t4n0AAAAJ

*Samarin, N., Kothari, S., Siyed, Z., Bjorkman, O., Yuan, R., Wijesekera, P., Alomar, N., Fischer, J., Hoofnagle, C., and Egelman, S.* Proceedings on Privacy Enhancing Technologies (PoPETS) *3 (2023).*

Developers Say the Darndest Things: Privacy Compliance Processes Followed by Developers of Child-Directed Apps
*Alomar, N., and Egelman, S.* Proceedings on Privacy Enhancing Technologies (PoPETS) *4 (2022) pp. 250–273.*

Data Collection Practices of Mobile Applications Played by Preschool-Aged Children
*Zhao, F., Egelman, S., Weeks, H. M., Kaciroti, N., Miller, A. L., and Radesky, J. S.* JAMA Pediatrics *174.12 (Dec. 2020).*

Nudge Me Right: Personalizing Online Security Nudges to People's Decision-Making Styles
*Peer, E., Egelman, S., Harbach, M., Malkin, N., Mathur, A., and Frik, A.* Computers in Human Behavior *109 (Aug. 2020).*

Disaster Privacy/Privacy Disaster
*Sanfilippo, M. R., Shvartzshnaider, Y., Reyes, I., Nissenbaum, H., and Egelman, S.* Journal of the Association for Information Science and Technology *(Mar. 2020).*

Can You Pay For Privacy? Consumer Expectations and the Behavior of Free and Paid Apps
*Bamberger, K. A., Egelman, S., Han, C., Elazari, A., and Reyes, I.* Berkeley Technology Law Journal *35 (2020).*

The Price is (Not) Right: Comparing Privacy in Free and Paid Apps
*Han, C., Reyes, I., Feal, Á., Reardon, J., Wijesekera, P., Vallina-Rodriguez, N., Elazari, A., Bamberger, K. A., and Egelman, S.* Proceedings on Privacy Enhancing Technologies (PoPETS) *3 (2020).*

Investigating Users' Preferences and Expectations for Always-Listening Voice Assistants
*Tabassum, M., Kosiński, T., Frik, A., Malkin, N., Wijesekera, P., Egelman, S., and Lipford, H. R.* Proceedings of the ACM on Interactive, Mobile, Wearable and Ubiquitous Technologies (IMWUT) *3.4 (Dec. 2019).* Association for Computing Machinery.

Privacy Attitudes of Smart Speaker Users
*Malkin, N., Deatrick, J., Tong, A., Wijesekera, P., Wagner, D., and Egelman, S.* Proceedings on Privacy Enhancing Technologies *2019.4 (2019).*

"Won't Somebody Think of the Children?" Examining COPPA Compliance at Scale
*Reyes, I., Wijesekera, P., Reardon, J., On, A. E. B., Razaghpanah, A., Vallina-Rodriguez, N., and Egelman, S.* Proceedings on Privacy Enhancing Technologies *2018.3 (2018) pp. 63–83.* **Caspar Bowden PET Award**

A Usability Evaluation of Tor Launcher
*Lee, L., Fifield, D., Malkin, N., Iyer, G., Egelman, S., and Wagner, D.* Proceedings on Privacy Enhancing Technologies *2017.3 (2017) pp. 87–106.*

The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study
*Tsai, J., Egelman, S., Cranor, L., and Acquisti, A.* Information Systems Research *22.2 (2011) pp. 254–268.* **AIS Best Publication of 2011 Award / INFORMS Best Published Paper Award (2012)**

P3P Deployment on Websites
*Cranor, L. F., Egelman, S., Sheng, S., McDonald, A. M., and Chowdhury, A.* Electronic Commerce Research and Applications *7.3 (2008) pp. 274–293.*

The Real ID Act: Fixing Identity Documents with Duct Tape
*Egelman, S., and Cranor, L. F.* I/S: A Journal of Law and Policy for the Information Society *2.1 (2006) pp. 149–183.*

**refereed conference publications**

Security and Privacy Failures in Popular 2FA Apps
*Gilsenan, C., Shakir, F., Alomar, N., and Egelman, S.* Proceedings of the 32nd USENIX Security Symposium *(USENIX Security '23), 2023.*

In the Room Where It Happens: Characterizing Local Communication and Threats in Smart Homes

*Girish, A., Hu, T., Prakash, V., Dubois, D. J., Matic, S., Huang, D. Y., Egelman, S., Reardon, J., Tapiador, J., Choffnes, D., and Vallina-Rodriguez, N.* Proceedings of the 2023 ACM on Internet Measurement Conference *(IMC '23), 2023, New York, NY, USA.*

Log: It's Big, It's Heavy, It's Filled with Personal Data!
Measuring the Logging of Sensitive Information in the Android Ecosystem
*Lyons, A., Gamba, J., Shawaga, A., Reardon, J., Tapiador, J., Egelman, S., and Vallina-Rodriguez, N.* Proceedings of the 32nd USENIX Security Symposium *(USENIX Security '23), 2023.*

Can Humans Detect Malicious Always-Listening Assistants?
A Framework for Crowdsourcing Test Drives
*Malkin, N., Wagner, D., and Egelman, S.* Proceedings of the ACM Conference On Computer-Supported Cooperative Work And Social Computing *(CSCW '22), 2022, New York, NY, USA.*

Runtime Permissions for Privacy in Proactive Intelligent Assistants
*Malkin, N., Wagner, D., and Egelman, S.* Eighteenth Symposium on Usable Privacy and Security *(SOUPS 2022), 2022.*

"You've Got Your Nice List of Bugs, Now What?" Vulnerability Discovery and Management Processes in the Wild
*Alomar, N., Wijesekera, P., Qiu, E., and Egelman, S.* Proceedings of the Sixteenth Symposium on Usable Privacy and Security *(SOUPS 2020), 2020.*

Actions Speak Louder than Words: Entity-Sensitive Privacy Policy and Data Flow Analysis with PoliCheck
*Andow, B., Mahmud, S. Y., Whitaker, J., Enck, W., Reaves, B., Singh, K., and Egelman, S.* 29th USENIX Security Symposium *(USENIX Security '20), 2020, Boston, MA.*

Don't Accept Candies from Strangers: An Analysis of Third-Party Mobile SDKs
*Feal, Á., Gamba, J., Tapiador, J., Wijesekera, P., Reardon, J., Egelman, S., and Vallina-Rodriguez, N.* International Conference on Computers, Privacy and Data Protection *(CPDP '20), 2020.*

A Qualitative Model of Older Adults' Contextual Decision-Making About Information Sharing
*Frik, A., Bernd, J., Alomar, N., and Egelman, S.* Workshop on the Economics of Information Security *(WEIS '20), 2020.*

Empirical Measurement of Systemic 2FA Usability
*Reynolds, J., Samarin, N., Barnes, J., Judd, T., Mason, J., Bailey, M., and Egelman, S.* Proceedings of the 29th USENIX Security Symposium *(USENIX Security '20), 2020.*

A Promise Is A Promise: The Effect of Commitment Devices on Computer Security Intentions
*Frik, A., Malkin, N., Harbach, M., Peer, E., and Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '19), 2019.*

Privacy and Security Threat Models and Mitigation Strategies of Older Adults
*Frik, A., Nurgalieva, L., Bernd, J., Lee, J. S., Schaub, F., and Egelman, S.* Proceedings of the 15th Symposium on Usable Privacy and Security *(SOUPS '19), 2019, Berkeley, CA, USA.*

Information Design in An Aged Care Context
*Nurgalieva, L., Frik, A., Ceschel, F., Egelman, S., and Marchese, M.* Proceedings of the 13th International Conference on Pervasive Computing Technologies for Healthcare *(PervasiveHealth '19), 2019, New York, NY, USA.*

50 Ways to Leak Your Data:
An Exploration of Apps' Circumvention of the Android Permissions System
*Reardon, J., Feal, A., Wijesekera, P., On, A. E. B., Vallina-Rodriguez, N., and Egelman, S.* Proceedings of the 24th USENIX Security Symposium *(USENIX Security '19), 2019, Berkeley, CA, USA.* **USENIX Security Distinguished Paper Award / AEPD Emilio Aced Personal Data Protection Research Award / CNIL-INRIA Privacy Award**

An Experience Sampling Study of User Reactions to Browser Warnings in the Field
*Reeder, R. W., Felt, A. P., Consolvo, S., Malkin, N., Thompson, C., and Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '18), 2018.*

Contextualizing Privacy Decisions for Better Prediction (and Protection)

*Wijesekera, P., Reardon, J., Reyes, I., Tsai, L., Chen, J.-W., Good, N., Wagner, D., Beznosov, K., and Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '18)*, 2018. **SIGCHI Honorable Mention Award**

Let's go in for a closer look: Observing passwords in their natural habitat
*Pearman, S., Thomas, J., Naeini, P. E., Habib, H., Bauer, L., Christin, N., Cranor, L. F., Egelman, S., and Forget, A.* Proc. of the ACM SIGSAC Conference on Computer & Communications Security *(CCS '17)*, 2017, New York, NY, USA.

Turtle Guard: Helping Android Users Apply Contextual Privacy Preferences
*Tsai, L., Wijesekera, P., Reardon, J., Reyes, I., Egelman, S., Wagner, D., Good, N., and Chen, J.-W.* Proceedings of the 13th Symposium on Usable Privacy and Security *(SOUPS '17)*, 2017.

The Feasibility of Dynamically Granted Permissions:
Aligning Mobile Privacy with User Preferences
*Wijesekera, P., Baokar, A., Tsai, L., Reardon, J., Egelman, S., Wagner, D., and Beznosov, K.* Proceedings of the 2017 IEEE Symposium on Security and Privacy *(Oakland '17)*, 2017.

Do or Do Not, There Is No Try: User Engagement May Not Improve Security Outcomes
*Forget, A., Pearman, S., Thomas, J., Acquisti, A., Christin, N., Cranor, L. F., Egelman, S., Harbach, M., and Telang, R.* Proc. of the 12th Symposium on Usable Privacy and Security *(SOUPS '16)*, 2016.

Behavior Ever Follows Intention? A Validation of the Security Behavior Intentions Scale (SeBIS)
*Egelman, S., Harbach, M., and Peer, E.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '16)*, 2016. **SIGCHI Honorable Mention Award**

The Anatomy of Smartphone Unlocking: A Field Study of Android Lock Screens
*Harbach, M., Luca, A. D., and Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '16)*, 2016. **SIGCHI Honorable Mention Award**

Keep on Lockin' in the Free World: A Transnational Comparison of Smartphone Locking
*Harbach, M., Luca, A. D., Malkin, N., and Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '16)*, 2016. **SIGCHI Honorable Mention Award**

The Teaching Privacy Curriculum
*Egelman, S., Bernd, J., Friedland, G., and Garcia, D.* Proceedings of the 47th ACM technical symposium on Computer Science Education *(SIGCSE '16)*, 2016.

Android Permissions Remystified: A Field Study on Contextual Integrity
*Wijesekera, P., Baokar, A., Hosseini, A., Egelman, S., Wagner, D., and Beznosov, K.* 24th USENIX Security Symposium *(USENIX Security 15)*, 2015, Washington, D.C.

Is This Thing On? Communicating Privacy on Ubiquitous Sensing Platforms
*Egelman, S., Kannavara, R., and Chow, R.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '15)*, 2015, New York, NY, USA.

Scaling the Security Wall: Developing a Security Behavior Intentions Scale (SeBIS)
*Egelman, S., and Peer, E.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '15)*, 2015, New York, NY, USA. **SIGCHI Honorable Mention Award**

Fingerprinting Web Users through Font Metrics
*Fifield, D., and Egelman, S.* Proceedings of the 19th international conference on Financial Cryptography and Data Security *(FC'15)*, 2015.

Somebody's Watching Me? Assessing the Effectiveness of Webcam Indicator Lights
*Portnoff, R., Lee, L., Egelman, S., Mishra, P., Leung, D., and Wagner, D.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '15)*, 2015, New York, NY, USA.

Are You Ready to Lock? Understanding User Motivations for Smartphone Locking Behaviors
*Egelman, S., Jain, S., Portnoff, R. S., Liao, K., Consolvo, S., and Wagner, D.* Proc. of the ACM SIGSAC Conference on Computer & Communications Security *(CCS '14)*, 2014, New York, NY, USA.

The Effect of Developer-Specified Explanations for Permission Requests on Smartphone User Behavior
*Tan, J., Nguyen, K., Theodorides, M., Negron-Arroyo, H., Thompson, C., Egelman, S., and Wagner,*

*D.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '14), 2014, Toronto, Canada.*

The Importance of Being Earnest [in Security Warnings]
*Egelman, S., and Schechter, S.* Proceedings of the 17th international conference on Financial Cryptography and Data Security *(FC'13), 2013, Okinawa, Japan.*

My Profile Is My Password, Verify Me! The Privacy/Convenience Tradeoff of Facebook Connect
*Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '13), 2013, Paris, France.*

Does My Password Go up to Eleven? The Impact of Password Meters on Password Selection
*Egelman, S., Sotirakopoulos, A., Muslukhov, I., Beznosov, K., and Herley, C.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '13), 2013, Paris, France.*

When It's Better to Ask Forgiveness than Get Permission: Attribution Mechanisms for Smartphone Resources
*Thompson, C., Johnson, M., Egelman, S., Wagner, D., and King, J.* Proceedings of the Ninth Symposium on Usable Privacy and Security *(SOUPS '13), 2013, Newcastle, United Kingdom.*

Android permissions: user attention, comprehension, and behavior
*Felt, A. P., Ha, E., Egelman, S., Haney, A., Chin, E., and Wagner, D.* Proceedings of the Eighth Symposium on Usable Privacy and Security *(SOUPS '12), 2012, Washington, D.C.* **SOUPS Best Paper Award (2012) / SOUPS Impact Award (2017)**

Facebook and privacy: it's complicated
*Johnson, M., Egelman, S., and Bellovin, S. M.* Proceedings of the Eighth Symposium on Usable Privacy and Security *(SOUPS '12), 2012, Washington, D.C.*

It's all about the Benjamins: Incentivizing users to ignore security advice
*Christin, N., Egelman, S., Vidas, T., and Grossklags, J.* Proceedings of the 15th international conference on Financial Cryptography and Data Security *(FC'11), 2011, Gros Islet, St. Lucia.*

Oops, I did it again: mitigating repeated access control errors on facebook
*Egelman, S., Oates, A., and Krishnamurthi, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '11), 2011, Vancouver, BC, Canada.*

Of passwords and people: measuring the effect of password-composition policies
*Komanduri, S., Shay, R., Kelley, P. G., Mazurek, M. L., Bauer, L., Christin, N., Cranor, L. F., and Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '11), 2011, Vancouver, BC, Canada.* **SIGCHI Honorable Mention Award**

Timing is everything?: the effects of timing and placement of online privacy indicators
*Egelman, S., Tsai, J., Cranor, L. F., and Acquisti, A.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '09), 2009, Boston, MA, USA.*

It's No Secret: Measuring the Security and Reliability of Authentication via 'Secret' Questions
*Schechter, S., Brush, A. J. B., and Egelman, S.* Proceedings of the 2009 IEEE Symposium on Security and Privacy *(Oakland '09), 2009, Los Alamitos, CA, USA.*

It's not what you know, but who you know: a social approach to last-resort authentication
*Schechter, S., Egelman, S., and Reeder, R. W.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '09), 2009, Boston, MA, USA.*

Crying wolf: an empirical study of SSL warning effectiveness
*Sunshine, J., Egelman, S., Almuhimedi, H., Atri, N., and Cranor, L. F.* Proceedings of the 18th USENIX Security Symposium *(SSYM'09), 2009, Montreal, Canada.*

Family accounts: a new paradigm for user accounts within the home environment
*Egelman, S., Brush, A. J. B., and Inkpen, K. M.* Proceedings of the 2008 ACM Conference on Computer Supported Cooperative Work *(CSCW '08), 2008, San Diego, CA, USA.*

You've Been Warned: An empirical study of the effectiveness of browser phishing warnings
*Egelman, S., Cranor, L. F., and Hong, J.* CHI '08: Proceeding of The 26th SIGCHI Conference on Human Factors in Computing Systems *(CHI '08), 2008, Florence, Italy.* **SIGCHI Honorable Mention Award**

Phinding Phish: Evaluating Anti-Phishing Tools

*Zhang, Y., Egelman, S., Cranor, L. F., and Hong, J. Proceedings of the 14th Annual Network & Distributed System Security Symposium (NDSS '07), 2007, San Diego, CA.*

Power Strips, Prophylactics, and Privacy, Oh My!

*Gideon, J., Egelman, S., Cranor, L., and Acquisti, A. Proceedings of the Second Symposium on Usable Privacy and Security (SOUPS '06), 2006, Pittsburgh, PA.*

An analysis of P3P-enabled web sites among top-20 search results

*Egelman, S., Cranor, L. F., and Chowdhury, A. Proceedings of the 8th international conference on Electronic commerce: The new e-commerce: innovations for conquering current barriers, obstacles and limitations to conducting successful business on the internet (ICEC '06), 2006, Fredericton, New Brunswick, Canada.*

**refereed workshop publications**

Challenges in Inferring Privacy Properties of Smart Devices:
Towards Scalable Multi-Vantage Point Testing Methods

*Girish, A., Prakash, V., Egelman, S., Reardon, J., Tapiador, J., Huang, D. Y., Matic, S., and Vallina-Rodriguez, N. Proceedings of the 3rd International CoNEXT Student Workshop (CoNEXT-SW '22), 2022, Rome, Italy.*

Identifying and Classifying Third-Party Entities in Natural Language Privacy Policies

*Hosseini, M. B., Pragyan, K., Reyes, I., and Egelman, S. Proceedings of the Second Workshop on Privacy in Natural Language Processing (PrivateNLP '20), 2020.*

Do You Get What You Pay For? Comparing The Privacy Behaviors of Free vs. Paid Apps

*Han, C., Reyes, I., On, A. E. B., Reardon, J., Feal, A., Bamberger, K. A., Egelman, S., and Vallina-Rodriguez, N. The Workshop on Technology and Consumer Protection (ConPro '19), 2019.*

Privacy Controls for Always-Listening Devices

*Malkin, N., Egelman, S., and Wagner, D. Proceedings of the New Security Paradigms Workshop (NSPW '19), 2019, San Carlos, Costa Rica.*

On The Ridiculousness of Notice and Conset: Contradictions in App Privacy Policies

*Okoyomon, E., Samarin, N., Wijesekera, P, On, A. E. B., Vallina-Rodriguez, N., Reyes, I., Feal, A., and Egelman, S. The Workshop on Technology and Consumer Protection (ConPro '19), 2019.*

Better Late(r) than Never: Increasing Cyber-Security Compliance by Reducing Present Bias

*Frik, A., Egelman, S., Harbach, M., Malkin, N., and Peer, E. Workshop on the Economics of Information Security (WEIS '18), 2018.*

"What Can't Data Be Used For?" Privacy Expectations about Smart TVs in the U.S.

*Malkin, N., Bernd, J., Johnson, M., and Egelman, S. Proceedings of the European Workshop on Usable Security (EuroUSEC '18), 2018.*

Personalized Security Messaging: Nudges for Compliance with Browser Warnings

*Malkin, N., Mathur, A., Harbach, M., and Egelman, S. Proceedings of the European Workshop on Usable Security (EuroUSEC '17), 2017.*

"Is Our Children's Apps Learning?" Automatically Detecting COPPA Violations

*Reyes, I., Wijesekera, P, Razaghpanah, A., Reardon, J., Vallina-Rodriguez, N., Egelman, S., and Kreibich, C. The Workshop on Technology and Consumer Protection (ConPro '17), 2017.*

Information Disclosure Concerns in The Age of Wearable Computing

*Lee, L. N., Lee, J. H., Egelman, S., and Wagner, D. Proceedings of the NDSS Workshop on Usable Security (USEC '16), 2016.*

The Myth of the Average User:
Improving Privacy and Security Systems through Individualization

*Egelman, S., and Peer, E. Proceedings of the 2015 Workshop on New Security Paradigms (NSPW '15), 2015, Twente, The Netherlands.*

Teaching Privacy: What Every Student Needs to Know

*Friedland, G., Egelman, S., and Garcia, D.* Proceedings of the 46th SIGCSE technical symposium on computer science education *(Workshop), 2015.*

U-PriSM 2: The Second Usable Privacy and Security for Mobile Devices Workshop
*Chiasson, S., Crawford, H., Egelman, S., and Irani, P.* Proc. of the 15th International Conference on Human-computer Interaction with Mobile Devices and Services *(MobileHCI '13), 2013, Munich, Germany.*

Markets for Zero-day Exploits: Ethics and Implications
*Egelman, S., Herley, C., and Oorschot, P. C. van* Proceedings of the 2013 Workshop on New Security Paradigms Workshop *(NSPW '13), 2013, Banff, Alberta, Canada.*

Choice Architecture and Smartphone Privacy: There's A Price for That
*Egelman, S., Felt, A. P., and Wagner, D.* The 2012 Workshop on the Economics of Information Security *(WEIS '12), 2012, Berlin, Germany.*

How Good Is Good Enough? The sisyphean struggle for optimal privacy settings
*Egelman, S., and Johnson, M.* Proceedings of the Reconciling Privacy with Social Media Workshop *(CSCW '12 Workshop), 2012, Seattle, WA.*

It's Not Stealing if You Need It: A Panel on the Ethics of Performing Research Using Public Data of Illicit Origin
*Egelman, S., Bonneau, J., Chiasson, S., Dittrich, D., and Schechter, S.* Proceedings of the 16th International Conference on Financial Cryptography and Data Security *(FC'12), 2012.*

How to ask for permission
*Felt, A. P., Egelman, S., Finifter, M., Akhawe, D., and Wagner, D.* Proceedings of the 7th USENIX conference on Hot Topics in Security *(HotSec'12), 2012, Bellevue, WA.*

I've got 99 problems, but vibration ain't one: a survey of smartphone users' concerns
*Felt, A. P., Egelman, S., and Wagner, D.* Proceedings of the second ACM workshop on Security and privacy in smartphones and mobile devices *(SPSM '12), 2012, Raleigh, North Carolina, USA.*

Toward Privacy Standards Based on Empirical Studies
*Egelman, S., and McCallister, E.* The Workshop on Web Tracking and User Privacy *(W3C Workshop), 2011, Princeton, NJ.*

Please Continue to Hold: An Empirical Study on User Tolerance of Security Delays
*Egelman, S., Molnar, D., Christin, N., Acquisti, A., Herley, C., and Krishnamurthi, S.* Workshop on the Economics of Information Security (WEIS '10) *(WEIS '10), 2010, Cambridge, MA.*

Tell Me Lies: A Methodology for Scientifically Rigorous Security User Studies
*Egelman, S., Tsai, J., and Cranor, L. F.* Proceedings of the Workshop on Studying Online Behavior *(CHI '10 Workshop), 2010, Atlanta, GA.*

This is Your Data on Drugs: Lessons Computer Security Can Learn from the Drug War
*Molnar, D., Egelman, S., and Christin, N.* Proceedings of the 2010 Workshop on New Security Paradigms *(NSPW '10), 2010, Concord, Massachusetts, USA.*

Security user studies: methodologies and best practices
*Egelman, S., King, J., Miller, R. C., Ragouzis, N., and Shehan, E.* CHI '07 Extended Abstracts on Human Factors in Computing Systems *(CHI EA '07), 2007, San Jose, CA, USA.*

The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study
*Tsai, J., Egelman, S., Cranor, L., and Acquisti, A.* Proceedings of the 2007 Workshop on the Economics of Information Security *(WEIS '07), 2007, Pittsburgh, PA, USA.*

Studying the Impact of Privacy Information on Online Purchase Decisions
*Egelman, S., Tsai, J., Cranor, L. F., and Acquisti, A.* Proceedings of the Workshop on Privacy and HCI: Methodologies for Studying Privacy Issues *(CHI '06 Workshop), 2006, Montreal, Canada.*

**book chapters and magazine articles**

50 Ways to Leak Your Data: An Exploration of Apps' Circumvention of the Android Permissions System

Reardon, J., Feal, Á., Wijesekera, P., On, A. E. B., Vallina-Rodriguez, N., and Egelman, S. *;login:* 2019, USENIX Association.

Predicting Privacy and Security Attitudes
Egelman, S., and Peer, E. *Computers and Society*, 2015, ACM.

Crowdsourcing
Egelman, S., Chi, E., and Dow, S. *Ways of Knowing in HCI*, 2013, Springer.

Helping users create better passwords
Ur, B., Kelley, P. G., Komanduri, S., Lee, J., Maass, M., Mazurek, M., Passaro, T., Shay, R., Vidas, T., Bauer, L., Christin, N., Cranor, L. F., Egelman, S., and Lopez, J. *;login:* 2012, USENIX Association.

Suing Spammers for Fun and Profit
Egelman, S. *;login:* 2004, USENIX Association.

Installation
Egelman, S. *Peter Norton's Complete Guide to Linux*, 1999, Macmillan Computer Publishing.

User Administration
Egelman, S. *Peter Norton's Complete Guide to Linux*, 1999, Macmillan Computer Publishing.

## **awa**rds and recognition

2022      **CNIL-INRIA Privacy Award**
*50 Ways to Leak Your Data: An Exploration of Apps' Circumvention of the Android Permissions System*, with J. Reardon, A. Feal, P. Wijesekera, A. Elazari Bar On, and N. Vallina-Rodriguez.

**Emilio Aced Personal Data Protection Research Award**
*50 Ways to Leak Your Data: An Exploration of Apps' Circumvention of the Android Permissions System*, with J. Reardon, A. Feal, P. Wijesekera, A. Elazari Bar On, and N. Vallina-Rodriguez.

2020      **Caspar Bowden Award for Outstanding Research in Privacy Enhancing Technologies**
*"Won't Somebody Think of the Children?" Examining COPPA Compliance at Scale*, with I. Reyes, P. Wijesekera, J. Reardon, A. Elazari, A. Razaghpanah, and N. Vallina-Rodriguez.

2019      **USENIX Security Symposium Distinguished Paper Award**
*50 Ways to Leak Your Data: An Exploration of Apps' Circumvention of the Android Permissions System*, with J. Reardon, A. Feal, P. Wijesekera, A. Elazari Bar On, and N. Vallina-Rodriguez.

2018      **SIGCHI Honorable Mention Award (Best Paper Nominee)**
*Contextualizing Privacy Decisions for Better Prediction (and Protection)*, with P. Wijesekera, J. Reardon, I. Reyes, L. Tsai, J.-W. Chen, N. Good, D. Wagner, and K. Beznosov.

2017      **Symposium on Usable Privacy and Security (SOUPS) Impact Award**
*Android Permissions: User Attention, Comprehension, and Behavior*, with A. P. Felt, E. Ha, A. Haney, E. Chin, and D. Wagner.

**Elected ACM Senior Member**             Association for Computing Machinery (ACM)

2016      **Symposium on Usable Privacy and Security (SOUPS) Distinguished Poster Award**
*Risk Compensation in Home-User Computer Security Behavior: A Mixed-Methods Exploratory Study*, with S. Pearman, A. Kumar, N. Munson, C. Sharma, L. Slyper, L. Bauer, and N. Christin.

**SIGCHI Honorable Mention Award (Best Paper Nominee)**
*Behavior Ever Follows Intention? A Validation of the Security Behavior Intentions Scale (SeBIS)*, with M. Harbach and E. Peer.

**SIGCHI Honorable Mention Award (Best Paper Nominee)**
*The Anatomy of Smartphone Unlocking: A Field Study of Android Lock Screens*, with M. Harbach and A. De Luca.

**SIGCHI Honorable Mention Award (Best Paper Nominee)**
*Keep on Lockin' in the Free World: A Transnational Comparison of Smartphone Locking*, with M. Harbach, A. De Luca, and N. Malkin.

2015    **SIGCHI Honorable Mention Award (Best Paper Nominee)**
*Scaling the Security Wall: Developing a Security Behavior Intentions Scale*, with E. Peer.

2012    **AIS Best Publication of 2011**
*The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study*, with J. Tsai, L. Cranor, and A. Acquisti.

**ISR Best Published Paper**
*The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study*, with J. Tsai, L. Cranor, and A. Acquisti.

**SOUPS Best Paper Award**
*Android Permissions: User Attention, Comprehension, and Behavior*, with A. P. Felt, E. Ha, A. Haney, E. Chin, and D. Wagner.

2011    **SIGCHI Honorable Mention Award (Best Paper Nominee)**
*Of Passwords and People: Measuring the Effect of Password-Composition Policies*, with S. Komanduri, R. Shay, P. G. Kelley, M. Mazurek, L. Bauer, N. Christin, and L. F. Cranor.

2008    **SIGCHI Honorable Mention Award (Best Paper Nominee)**
*You've Been Warned: An Empirical Study of the Effectiveness of Web Browser Phishing Warnings*, with L. Cranor and J. Hong.

2006    **Tor Graphical User Interface Design Competition**
Phase 1 Overall Winner, with L. Cranor, J. Hong, P. Kumaraguru, C. Kuo, S. Romanosky, J. Tsai, and K. Vaniea.

**Publisher's Clearing House Finalist**
I *may* already be a winner.

# **exp**ert testimony and reports

2024    Expert witness for the plaintiffs in *Clark, et. al. v. Yodlee, Inc., No: 3:20-cv-05991-SK (N.D. Cal.)*. I provided a report explaining basic data protection concepts and consumer expectations.

2024    Independent expert witness appointed by the court in *Czarnionka v. The Epoch Times Association, Inc., No. 1:22-cv-6348 (S.D.N.Y.)*. I was asked to perform a technical analysis to confirm that the terms of the injunctive relief were being followed.

2023-2024    Expert witness for the plaintiffs in *Frasco v. Flo Health, et al., No. 3:21-cv-00757 (N.D. Cal.)*. I provided an expert report based on my forensic analysis of a mobile app's data collection behaviors (i.e., privacy analysis). I was deposed and also provided rebuttal reports of opposing experts.

2023    Expert witness for the California Department of Justice in *NetChoice, LLC v. Bonta, No. 5:22-cv-08861*. I provided a declaration opposing the motion to dismiss.

2022    Expert witness for the plaintiffs in *Hart, et al. v. TWC Product and Technology LLC, No. 4:20-cv-3842-JST*. I provided a rebuttal report and was deposed by opposing counsel.

2022    Expert witness for the District of Columbia Office of the Attorney General in *District of Columbia v. Town Sports International LLC*. I provided a rebuttal report on proper surveying methodology and was deposed by opposing counsel.

| | |
|---|---|
| 2021 | Expert witness testifying before the U.S. Senate (Committee on Commerce, Science, and Transportation), hearing on "Protecting Kids Online: Internet Privacy and Manipulative Marketing." Testimony available at: https://www.commerce.senate.gov/2021/5/protecting-kids-online-internet-privacy-and-manipulative-marketing |
| 2017-2019 | Expert witness for the plaintiffs in *Vizio, Inc., Consumer Privacy Litigation, No. 8:16-ml-02693-JLS-KES*, assisting with discovery strategy and providing explanations of relevant privacy research on users' willingness to pay for privacy in order to assist in quantifying damages. |
| 2016 | Expert witness for the FTC in *FTC v. Amazon.com, Inc., No. C14-1028-JCC*, providing testimony on human-computer interaction (HCI) evaluation methods and critiquing opposing expert's report. |
| 2014-2015 | Expert witness for the plaintiffs in *Doe vs. Twitter, Inc., No. CGC-10-503630*, providing explanations of relevant privacy research on users' willingness to pay for privacy in order to assist in quantifying damages. |
| 2014 | Expert witness for the plaintiffs in *Levy v. Universal Parking of Florida, LLC No. 13-cv-22122 (S.D. Fla.)*, providing written testimony on basic human-computer interaction concepts as they relate to smartphone usage. |
| 2013 | Expert witness for the plaintiffs in *LinkedIn User Privacy Litigation, No. 12-cv-03088-EJD (N.D. Cal.)*, providing explanations of information security concepts and providing original research on users' privacy expectations in order to demonstrate and quantify damages. |
| 2012 | Expert witness for the plaintiffs in *Netflix Privacy Litigation, No. 5:11-cv-00379-EJD (N.D. Cal.)*, providing explanations of relevant privacy research and the economics of information privacy in order to quantify damages. |

## grants awarded

| | | |
|---|---|---|
| 2023–2026 | **NSA: Improving Security and Safety of Neural Networks through Robust Training, Noise Augmentation, and Safety Metrics (H98230-23-C-0275)** | $750,000 |
| | Co-PI (PI: Michael Mahoney, International Computer Science Institute) | |
| 2023–2026 | **NSF: Measuring, Validating and Improving upon App-Based Privacy Nutrition Labels (CNS-2247951/2247952/2247953)** | $600,000 |
| | Principal Investigator (Collaborative with Adam Aviv, George Washington University; Chris Kanich, University of Illinois at Chicago) | |
| 2022–2025 | **NSF: Developer Implementation of Privacy in Software Systems (CCF-2217771/2217772)** | $750,000 |
| | Principal Investigator (Collaborative with Primal Wijesekera, International Computer Science Institute; Jon Atwell and Julian Nyarko, Stanford University) | |
| 2022–2026 | **KACST-UCB Center of Excellence for Secure Computing** | $6,460,000 |
| | Senior Personnel (PI: David Wagner, University of California, Berkeley) | |
| 2021–2022 | **CITRIS: Auditing the Compliance of California Consumer Privacy Regulations at Scale** | $60,000 |
| | Principal Investigator (Collaborative with Zubair Shafiq, University of California, Davis) | |
| 2019 | **Google: ASPIRE: SDK Traffic Identification at Scale** | $75,000 |
| | Principal Investigator | |
| 2018-2022 | **NSF: Mobile Dynamic Privacy and Security Analysis at Scale (CNS-1817248)** | $668,475 |
| | Principal Investigator | |
| 2018-2022 | **NSF: Contextual Integrity: From Theory to Practice (CNS-1801501/1801307/1801316)** | $1,199,462 |
| | Principal Investigator (Collaborative with Helen Nissenbaum, Cornell University; and Norman Sadeh, Carnegie Mellon University) | |

| | | |
|---|---|---|
| 2018-2022 | **NSF: Increasing Users' Cyber-Security Compliance by Reducing Present Bias (CNS-1817249)**<br>Principal Investigator | $558,018 |
| 2018-2023 | **NSA: The Science of Privacy: Implications for Data Usage (H98230-18-D-0006)**<br>Principal Investigator (Co-PI: Michael Tschantz, International Computer Science Institute) | $3,236,424 |
| 2018-2019 | **DHS: Scaling Contextual Privacy to MDM Environments (FA8750-18-2-0096)**<br>Principal Investigator | $480,000 |
| 2018-2019 | **Rose Foundation: AppCensus: Mobile App Privacy Analysis at Scale**<br>Principal Investigator (Co-PI: Irwin Reyes, International Computer Science Institute) | $40,000 |
| 2018 | **Cisco: Access Controls for an IoT World**<br>Principal Investigator | $99,304 |
| 2018 | **CLTC: Privacy Analysis at Scale**<br>Principal Investigator | $50,000 |
| 2018 | **CLTC: Secure Internet of Things for Senior Users**<br>Co-PI (PI: Alisa Frik, International Computer Science Institute) | $60,590 |
| 2017 | **Mozilla: Towards Usable IoT Access Controls in the Home**<br>Principal Investigator | $46,000 |
| 2017 | **Data Transparency Lab (DTL) / AT&T:**<br>**Transparency via Automated Dynamic Analysis at Scale**<br>Principal Investigator | $55,865 |
| 2017 | **CLTC: Secure & Usable Backup Authentication**<br>Co-PI (PI: David Wagner, University of California, Berkeley) | $48,400 |
| 2016 - 2017 | **NSF: Teaching Security in CSP (CNS-1636590)**<br>Co-PI (PI: Julia Bernd, ICSI) | $200,000 |
| 2016 - 2017 | **DHS: A Platform for Contextual Mobile Privacy (FA8750-16-C-0140)**<br>Principal Investigator | $664,378 |
| 2016 - 2018 | **CLTC: The Security Behavior Observatory**<br>Principal Investigator | $195,962 |
| 2016 | **CLTC: Using Individual Differences to Tailor Security Mitigations**<br>Principal Investigator | $100,000 |
| 2015 - 2018 | **NSF/BSF: Using Individual Differences to Personalize Security Mitigations (CNS-1528070/BSF-2014626)**<br>Principal Investigator (Collaborative with Eyal Peer, Bar-Ilan University) | $724,732 |
| 2015 - 2019 | **NSF: Security and Privacy for Wearable and Continuous Sensing Platforms (CNS-1514211/1514457/1513584)**<br>Principal Investigator (Collaborative with David Wagner, University of California, Berkeley; and Franziska Roesner, University of Washington) | $1,200,000 |
| 2014 - 2016 | **NSF: Teachers' Resources for Online Privacy Education (DGE-1419319)**<br>Co-PI (PI: Gerald Friedland, ICSI) | $300,000 |
| 2014 - 2017 | **NSA: User Security Behavior**<br>Subcontract (PIs: Lorrie Cranor, Rahul Telang, Alessandro Acquisti, and Nicholas Christin; Carnegie Mellon University) | $200,000 |
| 2014 | **Google: Improving Security Warnings by Examining User Intent**<br>Principal Investigator | $71,500 |

| | | |
|---|---|---|
| 2013 - 2015 | **NSF: Designing Individualized Privacy and Security Systems (CNS-1343433/1343451)** | $132,620 |
| | Principal Investigator (Collaborative with Eyal Peer, Carnegie Mellon University) | |
| 2013 - 2016 | **NSF: A Choice Architecture for Mobile Privacy and Security (CNS-1318680)** | $500,000 |
| | Co-PI (PI: David Wagner, University of California, Berkeley) | |
| 2010 | **Google: Designing Usable Certificate Dialogs in Chrome** | $60,000 |
| | Principal Investigator | |

## patents awarded

| | |
|---|---|
| 2023 | Automatic identification of applications that circumvent permissions and/or obfuscate data flows (US Patent 11,689,551) |

## professional activities

### program committees

| | |
|---|---|
| 2023 | Privacy Enhancing Technologies Symposium (PETS); IEEE Security & Privacy; Workshop on Economics and Information Security (WEIS) |
| 2022 | Contextual Integrity (CI) Symposium |
| 2021 | Workshop on Economics and Information Security (WEIS) |
| 2020 | ACM CCS; Workshop on Economics and Information Security (WEIS); Symposium on Usable Privacy and Security (SOUPS); USENIX Security |
| 2019 | Privacy Enhancing Technologies Symposium (PETS); Workshop on Economics and Information Security (WEIS); Symposium on Usable Privacy and Security (SOUPS) |
| 2018 | ACM SIGCHI (Human Factors in Computing Systems); Privacy Enhancing Technologies Symposium (PETS); Workshop on Economics and Information Security (WEIS); ACM Conference on Computer and Communications Security (CCS); Symposium on Usable Privacy and Security (SOUPS); IEEE Security & Privacy ("Oakland") |
| 2017 | ACM SIGCHI (Human Factors in Computing Systems); USENIX Security; Privacy Enhancing Technologies Symposium (PETS); New Security Paradigms Workshop (NSPW), **Co-Chair**; Workshop on Economics and Information Security (WEIS); ACM Conference on Computer and Communications Security (CCS); Symposium on Usable Privacy and Security (SOUPS) |
| 2016 | Workshop on the Economics of Information Security (WEIS), **Chair**; New Security Paradigms Workshop (NSPW), **Co-Chair**; ACM SIGCHI (Human Factors in Computing Systems); USENIX Security; Symposium on Usable Privacy and Security (SOUPS); ACM WWW; Financial Cryptography and Data Security; Privacy Enhancing Technologies Symposium (PETS) |
| 2015 | Symposium on Usable Privacy and Security (SOUPS); USENIX Security; ACM SIGCHI (Human Factors in Computing Systems); Privacy Enhancing Technologies Symposium (PETS); Workshop on the Economics of Information Security (WEIS); ACM WWW; Financial Cryptography and Data Security |
| 2014 | ACM SIGCHI (Human Factors in Computing Systems); Financial Cryptography and Data Security; ACM WWW; Privacy Enhancing Technologies Symposium (PETS) |
| 2013 | ACM SIGCHI (Human Factors in Computing Systems); Symposium on Usable Privacy and Security (SOUPS); New Security Paradigms Workshop (NSPW); Anti-Phishing Working Group eCrime Researchers Summit |
| 2012 | Symposium on Usable Privacy and Security (SOUPS); New Security Paradigms Workshop (NSPW) |

| | |
|---|---|
| 2011 | Symposium On Usable Privacy and Security (SOUPS); New Security Paradigms Workshop (NSPW); Computers, Freedom, and Privacy (CFP) Conference (poster session co-chair); Software and Usable Security Aligned for Good Engineering (SAUSAGE) Workshop, **Co-Chair** |
| 2010 | Symposium On Usable Privacy and Security (SOUPS) |
| 2008 | Conference on Information and Knowledge Management (CIKM) |
| 2007 | ACM SIGCHI Workshop - Security User Studies: Methodologies and Best Practices; Anti-Phishing Working Group eCrime Researchers Summit (poster session co-chair) |
| 2006 | Computers, Freedom, and Privacy (CFP) Conference |

### standards committees

| | |
|---|---|
| 2007-2008 | W3C Web Security Context (WSC) Working Group |
| 2004-2006 | W3C Platform for Privacy Preferences (P3P) 1.1 Working Group |

### leadership roles

| | |
|---|---|
| 2012-Now | Director, Berkeley Laboratory for Usable and Experimental Security (BLUES) |
| 2021-2023 | Member, ICSI Scientific Leadership Council |
| 2006-2008 | Legislative Concerns Chair / Board of Directors, National Association of Graduate and Professional Students (NAGPS) |
| 2006-2008 | Vice President for External Affairs, Carnegie Mellon Graduate Student Assembly |

# teaching

| | | |
|---|---|---|
| Fall 2019 | **Usable Privacy and Security** | University of California, Berkeley |
| | Designed and taught a course as part of the School of Information's Masters in Cybersecurity program. Duties included course design and development, grading assignment and exams, supervising class projects, and holding office hours. | |
| Spring 2017, Spring 2018 | **Human Factors in Computer Security and Privacy** | Brown University |
| | Instructor for a module on "user interfaces for security" as part of the Executive Masters in Cybersecurity program. Duties included course design and development, grading assignments and exams, supervising thesis projects, and holding office hours. | |
| Fall 2007 | **Information Security & Privacy (46-861)** | Carnegie Mellon University |
| | Teaching assistant duties included developing course materials (topics for lectures, assignments, and exams), grading assignments and exams, holding office hours, and mentoring students about semester-long projects. | |
| Spring 2006 | **Computers and Society (15-290)** | Carnegie Mellon University |
| | Teaching assistant duties included giving guest lectures, creating assignments and exams, grading assignments and exams, holding office hours, and mentoring students about semester-long projects. | |
| Fall 2003 | **Information Security (CS 451)** | University of Virginia |
| | Teaching assistant duties included giving guest lectures, creating assignments and exams, grading assignments and exams, and holding office hours. | |
| Fall 2003 | **Intellectual Property (TCC 200)** | University of Virginia |
| | Teaching assistant duties included grading assignments and holding office hours. | |
| Spring 2003, Spring 2004 | **Advanced Software Development Methods (CS 340)** | University of Virginia |
| | Teaching assistant duties included grading and holding office hours. | |
| Fall 2002 | **Engineering Software (CS 201J)** | University of Virginia |
| | Teaching assistant duties included grading assignments and holding office hours. | |